MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
Division of Law
124 Halsey Street
P.O. Box 45029
Newark, New Jersey 07101
*Attorney for Plaintiffs*

### UNITED STATE DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY
### NEWARK VICINAGE

| | |
|---|---|
| MATTHEW J. PLATKIN, Attorney General of the STATE OF NEW JERSEY, and ELIZABETH M. HARRIS, Acting Director of the New Jersey Division of Consumer Affairs,<br><br>        Plaintiffs,<br><br>    v.<br><br>SIG SAUER, INC.,<br><br>        Defendant. | Hon. Susan D. Wigenton, U.S.D.J.<br>Hon. Jessica S. Allen, U.S.M.J.<br><br>Civil Action No.: 2:25-cv-17797<br><br><u>Civil Action</u> |

### FIRST AMENDED COMPLAINT

Matthew J. Platkin, Attorney General of the State of New Jersey (the "Attorney General"), and Elizabeth M. Harris, Acting Director of the New Jersey Division of Consumer Affairs (the "Acting Director") (collectively, the "Plaintiffs"), by and through their undersigned counsel, hereby allege as follows against Sig Sauer, Inc. ("Sig Sauer").

### INTRODUCTION

1.        On February 28, 2022, Raymond Tillotson, an officer of the Howell Township Police Department, was attending a firearms course at the New Jersey State Police Academy in Sea Girt, New Jersey. Officer Tillotson holstered his Sig Sauer Model P320 service weapon, when

the P320 suddenly fired. A bullet tore through his calf and into his foot. He had not pulled the trigger.[1]

2.    This was not the first time a Sig Sauer P320 service weapon had fired unintentionally in New Jersey. It was not even the first time it happened to an officer from Howell Township.[2]

3.    Nor was it the last time a Sig Sauer P320 in New Jersey in the possession of an experienced New Jersey law enforcement officer unintentionally shot its own user. In 2023, West Orange police officer Gregory Willis holstered his Sig Sauer P320 when it suddenly discharged a bullet through his thigh.[3] In April of the same year, Detective Lieutenant Walter Imbert, the Orange Police Department's range master and an Army veteran, was preparing to clean his Sig Sauer P320 when it suddenly fired, killing him instantly. His finger was not touching the trigger. In 2024, Detective Mark Cunard of the Camden County Prosecutor's Office was shot in his thigh and knee by his holstered Sig Sauer P320 simply while walking to his vehicle.[4]

4.    Sig Sauer P320 owners in New Jersey have experienced their own unintended shootings.[5]

---

[1] See Compl. ¶¶ 165–75, Harp v. Sig Sauer, Inc., No. 24-cv-58 (D.N.H. Feb. 27, 2024), ECF No. 1 ("Harp Compl.").

[2] Id. at ¶ 73 (citing a June 20, 2017 incident).

[3] See Am. Compl. ¶¶ 176–84, Willis v. Sig Sauer, Inc., No. 25-cv-66 (D.N.H. May 20, 2025), ECF No. 21 ("Willis Am. Compl.").

[4] See Compl. ¶¶ 224–30, Anderson v. Sig Sauer, Inc., No. 1:25-cv-00113 (D.N.H. Mar. 26, 2025), ECF No. 1 ("Anderson Compl.").

[5] See, e.g., id. at ¶¶ 315–22 (civilian gun owner of Parlin, New Jersey, was shot in his thigh and calf by his holstered Sig Sauer P320 in August 2023); Compl. ¶¶ 173–79, Bevacqua et al. v. Sig Sauer, Inc., No. 1:23-cv-00209 (D.N.H. Mar. 27, 2023), ECF No. 1 ("Bevacqua Compl.") (civilian gun owner of Montville, New Jersey, was shot while racking a Sig Sauer P320 in his home in October 2022). See Darryl C. Murphy, SEPTA Cop Whose Gun Mysteriously Fired Cleared of Wrongdoing, Litigation Against Gunmaker 'Pending', WHYY (Dec. 12, 2019),

5.      Throughout New Jersey, and across the country, Sig Sauer P320s have fired when their users did not want them to, with gruesome regularity. The victims include law enforcement officers, combat veterans, firearms instructors, and a wide range of civilian gun owners.

6.      Of course, the harm caused by the Sig Sauer P320 extends beyond the immediate victims in concentric circles, to their families, friends, and colleagues. Across the country, families have suffered greatly from the injury and death of loved ones. Children have experienced the panic of witnessing a gun suddenly firing at a football game,[6] in a school bathroom,[7] in a school parking lot,[8] or in a school cafeteria.[9] They have been traumatized by seeing a trained officer bleeding in

---

https://whyy.org/articles/septa-cop-whose-gun-mysteriously-fired-cleared-of-wrongdoing-litigation-against-gunmaker-pending (Frank Kneski was shot while attempting to remove his holster with his off-duty weapon, a Sig Sauer P320).

[6] See Dakota Morrissiey, MFPD Recalls Sidearms After Accidental Gun Discharge at School, DailyTrib.com (Sept. 24, 2024), https://www.dailytrib.com/2024/09/24/mfisd-officer-injured-in-accidental-gun-discharge-on-campus.

[7] See Todd Bookman, Officer's Gun that Fired Inside Massachusetts School is Latest Sig Sauer Incident, NHPR (Apr. 4, 2024, at 16:50 ET), https://www.nhpr.org/nh-news/2024-04-04/officers-gun-that-fired-inside-massachusetts-school-is-latest-sig-sauer-incident ("Officer's Gun that Fired Inside Massachusetts School"). This was the fourth Sig Sauer P320 unintended discharge reported by the Cambridge Police Department.

[8] On June 24, 2024, a school resource officer was walking to her vehicle when her holstered Sig Sauer P320 discharged in the school parking lot in front of a student. A video recording shows both of her hands holding objects and nowhere near the P320 when it discharged. See Dean J. Condoleo, Ceres Police Identify Officer Injured When Holstered Gun Went Off at School, The Modesto Bee (July 3, 2025, 17:53 PT), https://www.modbee.com/news/local/article309984160.html.

[9] See Molly Chepenik, Details Emerge in Officer's Accidental Shooting in School Cafeteria, WUFT NPR (Oct. 18, 2019, at 18:17 ET), https://www.wuft.org/fresh-take-florida/2019-10-18/details-emerge-in-officers-accidental-shooting-in-school-cafeteria. Two other officers from the same Department survived injuries caused by Sig Sauer P320 unintended discharges before Pasco County, Florida stopped using P320 service weapons. See Champe Barton & Tom Jackman, Popular Handgun Fires Without Anyone Pulling the Trigger, Victims Say, Wash. Post (Apr. 11, 2023), https://www.washingtonpost.com/dc-md-va/2023/04/11/victims-say-sig-sauer-p320-fires-on-own.

front of them, not knowing who or what has shot him, or whether they might be shot next. Many of the incidents have witnesses. Several are on videotape.

7.     A handgun that fires when the user does not want it to is defective. But the Sig Sauer P320 had repeatedly fired upon its own users, or those around them, when the users did not want it to.

8.     The Sig Sauer P320 is built with what Sig Sauer claims is a safe and innovative design. But, like a set mousetrap, a loaded P320 is always fully "cocked," meaning that once a round is in the chamber, the weapon is ready to fire because the firing mechanism has sufficient potential energy to initiate a discharge.[10] When a P320 user intends to fire a shot, they pull the trigger to release the cocked striker, which causes the weapon to fire. But preventing unwanted discharges of the P320 depends on the combination of a very sensitive trigger and the precise position and quality of other movable parts subject to foreseeable wear and tear. Far too often, under ordinary use, the P320 striker unintentionally releases, which causes it to impact the chambered round, firing the gun. This is in stark contrast to striker-fired handguns made by other manufacturers, which either do not use fully pre-cocked strikers, or use external safeties and internal restraints that are precisely designed and manufactured to prevent the striker from impacting the round without a deliberate trigger pull.

9.     It is no coincidence that so many of the known incidents of unintentional P320 discharges involve law enforcement officers. Law enforcement officers typically (indeed, are often

---

[10] Revolvers are manually "cocked" by pulling the hammer back until it stops; striker-fired pistols are "cocked" or "racked" or "cycled" by movement of the slide to the rear. In this First Amended Complaint, the term "cocked" is used consistently to refer to the condition of the striker being placed under tension by the spring, so that the gun is ready to fire.

required to) carry sidearms loaded with a round in the chamber, making them particularly vulnerable to the Sig Sauer P320's distinct risk that a chambered round could unintentionally fire.

10.     Since its introduction in 2014, Sig Sauer has highlighted the P320's "partially pretensioned striker" (*i.e.*, the fact that the gun is pre-cocked whenever a round is in the chamber) and its "short, crisp trigger pull" (*i.e.*, the fact that the gun has a hair trigger).[11] Sig Sauer has bragged that the P320 offered premium safety and performance without needing external safeties: "the P320 has no external safety . . . to snag or hang up on the draw."[12] Rather, Sig Sauer claimed, the P320 provided "an enhanced level of safety" through its internal restraints.[13] Sig Sauer's statements thus assured users that the P320 was *less* likely to unintentionally fire than other semiautomatic handguns with external safeties.

11.     But for years, Sig Sauer has known that the P320's internal "safeties" do not prevent the guns from firing when the user does not want them to fire. During a procurement evaluation in 2016 and 2017, the U.S. Army found that without an external safety that would prevent any accidental trigger movement, the Sig Sauer P320 posed an unacceptable danger of firing when the user did not want it to fire. The Army therefore required Sig Sauer to add a manual thumb safety feature for the variants of the P320 it procured, known as the M17 and M18.

12.     Nevertheless, Sig Sauer continued to sell P320s, without the external safety that the U. S. Army deemed critical, to the overwhelming majority of its civilian and law enforcement consumers. In fact, Sig Sauer never incorporated an external safety into its standard P320 offering for non-Army costumers. And in its marketing to the civilian and law enforcement markets, Sig

---

[11]   Products, Pistols, P320, Sig Sauer, [https://web.archive.org/web/20140121011820/http://www.sigsauer.com:80/CatalogProductList/pistols-p320.aspx] (archived Jan. 21, 2014).

[12]   Ibid.

[13]   Ibid.

Sauer advertised, without explanation, that the U.S. military had chosen the P320. To this day, Sig

Sauer's website touts that the P320 being marketed to law enforcement and civilian customers—

not the M17 or M18 models with external safeties actually used by the U.S. military—is "chosen

by all branches of the U.S. military."[14] Sig Sauer's marketing campaigns omit that the U.S. military

actually *refused* to procure the P320s that Sig Sauer was selling (and still sells) to law enforcement

and civilian markets until Sig Sauer added the external safety.

13.     At the same time that it was hiding the fact that the U.S. military demanded that the

P320 be fitted with external safeties, Sig Sauer told its customers that external safeties were not

necessary. But by 2017, the risk the Army had identified had materialized: Sig Sauer was receiving

notifications of real-life unintended discharges.[15]

14.     For years after safety concerns emerged, Sig Sauer repeatedly proclaimed: "Safety

Without Compromise," and "From the trigger, to the striker and even the magazine, **the P320**

**won't fire unless you want it to**."

---

[14] <u>Sig Sauer P365 & P320 Ranked Most Popular Handguns in America</u>, Sig Sauer (Jan. 31, 2024), https://www.sigsauer.com/blog/sig-sauer-p365—p320-ranked-most-popular-handguns-in-america.

[15] Among the many reports Sig Sauer received was the one concerning the first Howell incident. <u>See</u> Jose Pagliery, <u>Trigger Warning: The Army got upgraded guns. For months, the public didn't. Now, law enforcement officers are suing over a pistol that can fire when you drop it.</u>, CNN Investigates (June 6, 2018), https://www.cnn.com/interactive/2018/06/investigates/sig-sauer-p320-drop-fire ("Sig Sauer received several notifications about incidents nationwide that occurred from April to August of [2017], . . . [t]he company was also notified about an incident that occurred in Howell Township."); <u>see also</u> Harp Compl., supra n.1, ¶¶ 165–75.



15.     Sig Sauer even specifically assured customers that, because of the P320's "robust safety system," "you won't need a tabbed trigger safety," *i.e.*, a type of external safety used in other manufacturers' striker-fired handguns.

16.     Sig Sauer even advertised its omission of an external safety as demonstrating the superiority and "enhanced level of safety" of its handgun: Sig Sauer told the world that the P320's "internal restraints" rendered unnecessary the external safeties used in other leading striker-fired pistols to prevent unintended firing.

17.     But as law enforcement officers and civilians have experienced in incident after incident, Sig Sauer P320s *do* fire when the user does not want them to. While Sig Sauer has repeatedly cast the blame on the victims, in all too many incidents, security camera video footage

shows that the Sig Sauer P320 was holstered when it discharged, or fired without being touched by human hands.[16]

18.    At the end of 2017, following a deluge of criticism connected mostly to the P320's tendency to fire if dropped, Sig Sauer announced design changes to the P320. However, the "upgraded" and newly-designed P320s still fire when the user does not want them to.[17] That is because the "upgrade" purported to address the only problem Sig Sauer acknowledged: guns firing when dropped. But drop discharges represented only a fraction of the problem. In New Jersey and elsewhere, new and "upgraded" P320s continue to fire without anyone pulling the trigger, maiming or even killing users.[18]

19.    Following numerous incidents of unintended discharges within their departments, state and municipal police forces across the country, including Chicago, San Francisco, Milwaukee, Houston, Denver, and Pennsylvania's SEPTA, have removed the Sig Sauer P320 as a service weapon, replacing the guns, at their own considerable expense, and retraining their police officers to use different weapons.[19] On July 9, 2025, federal agents in Immigration and Customs Enforcement ("ICE") initiated a reevaluation of its decision to use P320s after several ICE officers were injured by their P320s firing unintendedly.[20]

---

[16] See infra Part IV ¶¶ 86, 89, 90.

[17] See infra Part II(B), IV.

[18] See infra Part IV ¶¶ 89–90; Compl. ¶¶ 130-34, Gomelskaya v. Sig Sauer, Inc., No. 241200470 (Phila. Ct. C.P. Dec. 11, 2024) ("Gomelskaya Compl.").

[19] See infra Part V.

[20] Miguel Ortiz, The Surprising FBI Evaluation and ICE Ban of the Troubled Sig Sauer P320, We Are the Mighty (July 10, 2025, at 8:34 PT), https://www.wearethemighty.com/tactical/the-fbi-evaluation-of-the-sig-sauer-p320.

20.     In July 2024, after a Michigan state trooper's upgraded P320 fired while holstered on his hip, the FBI's Ballistic Research Facility concluded, through a series of tests, that, even without any pressure on the trigger, "with movements representing those common to a law enforcement officer it is possible to render [the P320's key internal safety] inoperable and ineffective at preventing the striker from impacting a chambered round," which is what causes the gun to fire.[21]

21.     The FBI's analysis became public in July 2025. Later that month, a New Jersey State Police committee ordered the Sig Sauer P320 removed from the State Police's roster of firearms approved for troopers' off-duty use.

22.     Despite the growing evidence that P320s continue to fire unintendedly, Sig Sauer maintains that the changes it made starting in 2017 have fixed any problem for which Sig Sauer is responsible. Any unintended discharges, Sig Sauer insists, must be caused by user error. The company continues to sell its P320 to law enforcement and civilian customers without any further design changes, or any further warnings.

23.     Rather than fix the problem, Sig Sauer successfully lobbied the legislature in its home state of New Hampshire to ignore the advice of law enforcement officials from across the country,[22] and to grant Sig Sauer immunity from suits based upon the presence or absence of an

---

[21] FBI, Michigan State Police Sig Sauer M18 Evaluation 3 (Aug. 30, 2024).

[22] Kevin Landrigan, Law Enforcement Leaders Urge House to Reject Sig Sauer Immunity, N.H. Union Leader (May 21, 2025), https://www.unionleader.com/news/politics/state/sig-sauer-immunity-bill-clears-house-heads-to-ayotte/article_809ff7e1-3268-411e-bc2f-d448a72d5812.html ("[W]e urge lawmakers to reject proposals that seek to grant immunity based on a single manufacturer's request and based on a single gun–the P320 pistol–that has placed law enforcement officers and the general public at risk and unnecessarily harmed many.").

external safety.[23] But New Hampshire's laws do not prevent New Jersey from protecting its own residents.

24.    The Sig Sauer P320 is a threat to the New Jersey police officers, veterans, and everyday individuals who use and rely upon the gun, as well as to those around them.

25.    Thus, through this lawsuit, the Attorney General and the Acting Director of the Consumer Affairs Division seek an Order enjoining Sig Sauer from continuing to distribute its defective P320s to civilians and local law enforcement officers in New Jersey and to cease its unreasonable and deceptive marketing of its P320s to civilians and local law enforcement in New Jersey. Plaintiffs also seek abatement, damages, and restitution for the endangerment Sig Sauer has caused, and continues to cause, to New Jerseyans and the State through its unreasonable, unlawful, and dangerous conduct. [24]

26.    Plaintiffs do not assert any claims arising from acts on federal property, or arising from Defendant's provision of firearms to the federal government, and disclaim any entitlement to relief or remedies attributable to conduct on federal property or in connection with the provision of firearms to the federal government.

27.    Plaintiffs seek to ensure that Sig Sauer, the party that has profited from deceiving and misleading New Jersey consumers and the public about the dangers of the P320's design, bear the costs of the harm caused by the P320's unsafe design, and Sig Sauer's deceptive marketing, rather than the State, its taxpayers, its residents, or broader segments of the public.

---

[23] Todd Bookman, Facing a Wave of P320 Lawsuits, Sig Sauer Asked for Immunity. NH Lawmakers Granted It., NHPR (May 28, 2025), https://www.nhpr.org/nh-news/2025-05-28/sig-sauer-p320-pistol-gun-weapon-trigger-pull-safety-lawsuits-liability-immunity-new-hampshire ("Facing a Wave of P320 Lawsuits").

[24] In this First Amended Complaint, the words "New Jersey" and "State" refers to New Jersey's geographic area, excluding federal lands within its boundaries, unless otherwise stated.

### THE PARTIES

28.     Plaintiff Matthew J. Platkin is the Attorney General of the State of New Jersey. The Attorney General is authorized and charged with the responsibility to enforce the State's Firearms Industry Public Safety Law, N.J.S.A. 2C:58-35 ("Section 58-35"). The Attorney General brings claims under Section 58-35 by and through the Statewide Affirmative Firearms Enforcement Office ("SAFE"). SAFE was created within the Office of the Attorney General by Attorney General Administrative Executive Directive No. 2022-08, which also delegates to SAFE the Attorney General's statutory authority under Section 58-35.

29.     Plaintiff Elizabeth M. Harris is the Acting Director of the New Jersey Division of Consumer Affairs. The Attorney General is charged with enforcing the Consumer Fraud Act, N.J.S.A. 56:8-1 to -229 ("CFA"). N.J.S.A. 52:17B-5.7. The Director of the New Jersey Division of Consumer Affairs is charged with administering the CFA on behalf of the Attorney General. N.J.S.A. 52:17B-120, -124.

30.     The Attorney General and the Acting Director bring this action pursuant to their authority under the CFA, specifically N.J.S.A. 56:8-8, -11, -13, and -19.

31.     The Attorney General also asserts in this case his parens patriae authority to protect the safety, health, and welfare of New Jersey residents.

32.     Defendant Sig Sauer is a firearm importer, manufacturer and seller with a manufacturing facility located in Newington, New Hampshire. It is incorporated under Delaware law as a domestic for-profit corporation with its principal place of business at 72 Pease Boulevard, Newington, New Hampshire, 03801. Sig Sauer's firearm sales in the United States earn the company hundreds of millions of dollars in annual revenue. Sig Sauer is directly and materially involved in the machining, assembly, design, marketing, advertising, sales, and distribution of Sig

11

Sauer handguns for civilians and law enforcement personnel, including those residing in New Jersey.

## JURISDICTION AND VENUE

33.    This action was originally filed in the Superior Court of New Jersey, Chancery Division, on October 16, 2025, before Sig Sauer filed a notice of removal to federal court.

34.    In bringing this action, Plaintiffs properly invoked the jurisdiction of the Superior Court of New Jersey, Chancery Division[25] because the action arises from Sig Sauer's (1) deliberate targeting of New Jersey residents and law enforcement departments as customers and users; (2) deliberate partnering with New Jersey gun stores; and (3) Sig Sauer's regular, repeated, and systematic contacts with New Jersey. Sig Sauer has engaged in intentional acts directed to New Jersey, and thus could reasonably anticipate being haled into court in New Jersey.

35.    Sig Sauer has deliberately solicited, approved, and partnered with New Jersey-based gun stores in the sale of its P320 handguns; worked together with dealers in and around New Jersey to sell its P320 handguns to New Jersey law enforcement and civilians; marketed and advertised its P320 guns to New Jersey law enforcement and civilians; and, through its New Jersey business dealings, profited from its P320 sales to New Jersey.

36.    In particular, Sig Sauer markets and distributes its P320 guns through a network of affiliated gun dealers. Sig Sauer develops and maintains relationships with these authorized New Jersey dealers, incentivizing them to join Sig Sauer's network. Gun stores apply to be "SIG Law

---

[25] In short order, Plaintiffs intend to move to remand this action for lack of federal jurisdiction. This First Amended Complaint confirms that Plaintiffs' case, which asserts only claims arising under State law and seeks appropriately tailored relief, does not belong in federal court. Because "the jurisdictional basis for [a] suit is reviewed anew" when an amended complaint is filed, *Royal Canin U.S.A. v. Wullschleger*, 604 U.S. 22, 34 (2025), this is the operative pleading for the jurisdictional inquiry.

Enforcement and Military," "SIG," "SIG Elite," and "OFF-DUTY" dealers. Sig Sauer advertises its authorized dealers in New Jersey (including their location, contact information, and affiliate relationship with Sig Sauer) on its website, making them easy for potential customers to find. The dealers tout their status as authorized Sig Sauer dealers in their own marketing. Some of these dealers offer gunsmithing services on Sig Sauer P320s, including performing "SIG Upgrades."

37.     Sig Sauer's affiliate network in New Jersey is extensive: a recent search on the "Dealer Locator" page of Sig Sauer's website for "New Jersey" identified at least twenty New Jersey Sig Sauer authorized dealers.[26] These dealers work together with Sig Sauer to maximize sales of Sig Sauer P320 handguns to civilians and law enforcement in New Jersey.

38.     In addition to these formal New Jersey partnerships, Sig Sauer also distributes its P320s into New Jersey through other New Jersey dealers that sell or transfer its guns.

39.     The Superior Court of New Jersey has personal jurisdiction over Sig Sauer because these claims arise out of and relate to Sig Sauer's systematic marketing and sales targeting New Jersey in order to avail itself of the benefits of the New Jersey market. Sig Sauer therefore has sufficient minimum contacts with New Jersey, and engages in purposeful availment of the laws of New Jersey, sufficient to warrant the State Court's exercise of personal jurisdiction over Sig Sauer.

40.     Pursuant to Rule 4:3-2(a)(2) of the New Jersey Court Rules, venue is proper in Essex County because the causes of action arose, in part, in Essex County. More P320 injuries are known to have occurred in Essex County than in any other county in the State.

---

[26] Find a Dealer Near You, Sig Sauer, https://www.sigsauer.com/dealer-locator (last visited Oct. 15, 2025).

41.     Pursuant to Rule 4:3-2, venue is also proper in Essex County because it is a county in which at least one of the parties resides.

## FACTS

I.     **Sig Sauer Sells and Markets a Fully Pre-Cocked, Spring-Loaded, Striker-Fired Design.**

A.     **The Sig Sauer P320 Depends on Weak "Internal Safeties."**

42.     First released in 2014, the Sig Sauer P320 is the first line of "striker-fired" handguns that Sig Sauer manufactured. The striker—the component that impacts the round and causes it to fire—incorporates a spring.

43.     The P320 is designed so that, whenever the gun is loaded with a chambered round, the spring is fully compressed and the striker is in position to release. That is, a loaded Sig Sauer P320 with a chambered round is always fully cocked and ready to fire. The striker is held back under tension by an approximately one-millimeter ledge on a component called the sear.

44.     In this firing system, when the trigger is pulled rearward approximately two millimeters, it mechanically pushes forward a component called the "trigger bar." The trigger bar rotates the "safety lever," which disengages the "safety lock," a mechanism that otherwise catches the gun's striker and prevents a discharge. With two more millimeters of rearward trigger movement, the sear rotates downward, releasing the striker, which is propelled forward by the energy in the spring, striking the chambered round, and firing the gun.

45.     This system depends on the precise positioning and quality of these fire control system components, which are subject to a wide range of physical forces during ordinary use and handling. Those forces can cause the striker to unintentionally release into the round, firing it. In the words of the U.S. Court of Appeals for the Third Circuit, the P320's "internal safeties are not foolproof. The safety lock can be disengaged by pulling the trigger back as little as 1/13 of an

inch—about the thickness of a quarter. That would leave only the sear, which can be jostled loose."[27]

46.    Moreover, the 2024 FBI Ballistic Research Facility analysis found that the safety lock—which can disengage upon moving vertically less than a millimeter—can be disabled without any pressure on the trigger at all. This was based on testing that replicated the "disabling of the striker safety lock through movement and friction" alone. The analysis concluded that, "with movements representing those common to a law enforcement officer it is possible to render the Striker Safety lock inoperable and ineffective at preventing the striker from impacting a chambered round if complete sear engagement is lost."[28]

47.    Because neither the safety lock nor the striker is visible to the user, he or she has no way to determine if wear and tear has degraded or dislodged them such that minor external impacts encountered during ordinary use could cause the gun to fire without any user input.

48.    Despite these attributes, Sig Sauer does not include, on its standard law enforcement or commercial models, an external safety that would prevent trigger movement. Nothing about the Sig Sauer P320 design is inconsistent or incompatible with such an external trigger safety. To the contrary, Sig Sauer sells the military version of the P320 with a manual thumb safety that, when engaged, prevents trigger movement,[29] and offers such a safety as a non-standard *option* (which Sig Sauer claims is unnecessary) for some of its law enforcement and commercial models. Sig Sauer had once planned to introduce a different external safety option for

---

[27] See Slatowski v. Sig Sauer, Inc., 148 F.4th 132, 136 (3d Cir. 2025).

[28] FBI, supra n.21.

[29] A manual thumb safety is a physical lever that must be manually disengaged for the gun to fire. Sig Sauer uses this in the M17 and M18 versions of the P320 that it sells to the United States military.  See, e.g., P320-M17, Sig Sauer, https://www.https://www.sigsauer.com/p320-m17.html (last visited Oct. 15, 2025); see also supra Part I ¶¶ 11–13; infra Part II ¶¶ 55–61.

the P320, known as a "tabbed trigger safety," which would have likewise prevented unintended

trigger movement. However, Sig Sauer never made that tabbed trigger safety a part of its P320,

although it is commercially available as an aftermarket part.

49.    These features of the Sig Sauer P320 contrast with striker-fired handguns made by

other manufacturers, which either do not use fully pre-cocked strikers, or use external safeties and

internal restraints that are precisely designed and manufactured to prevent the striker from

impacting the round without a deliberate trigger pull. As the Third Circuit put it, the "P320's

design is unusual, making it much easier to fire—intentionally or not."[30]

**B.    From the Start, Sig Sauer Advertised the P320 as "Most Operator-Safety Focused."**

50.    Upon the P320's launch, Sig Sauer's website stated:

> Introducing the P320, a polymer-framed service pistol designed
> from the ground up with the input of law enforcement officers. The
> result is the most operator-safety focused striker duty pistol on the
> market today. . . . [T]he P320 provides an enhanced level of safety
> not found on most modern service pistols. . . . With a partially
> pretensioned striker, the P320 has a short, crisp trigger pull with a
> quick, pronounced reset right out-of-the-box. The P320 comes in
> two trigger variants: a standard trigger and a tabbed safety trigger
> for specific law enforcement clients. Featuring the SIG SAUER
> internal safety system, the P320 has no external safety or decocking
> lever to snag or hang up on the draw. A frame-mounted thumb safety
> version will be available for law enforcement needs.[31]

51.    Sig Sauer thus assured users that even though the P320 (a) employed a "partially

pretensioned striker" (*i.e.*, it is pre-cocked whenever a round is in the chamber), (b) has a "short,

crisp trigger pull" (*i.e.*, a hair trigger), and (c) "has no external safety," the P320 nonetheless

---

[30] See Slatowski, 148 F.4th at 135.

[31] Products, Pistols, P320, Sig Sauer, [https://web.archive.org/web/20140121011820/
http://www.sigsauer.com:80/CatalogProductList/pistols-p320.aspx] (archived Jan 21, 2014).

offered not only "an enhanced level of safety," but "the most operator-safety focused striker duty pistol on the market today."[32]

52.    The same theme continued throughout Sig Sauer's early marketing. In January 2017, Sig Sauer's website bragged that the P320's design offered "SAFETY WITHOUT COMPROMISE," that "The P320 maximizes peace of mind with a robust safety system," and, specifically, "you won't need a tabbed trigger safety for your gun to be drop safe:"[33]



53.    In truth, the Sig Sauer P320's internal restraints do not prevent unintended discharges. The "sear [] can be jostled loose,"[34] and when that happens, only the safety lock can catch the striker and prevent a shot. But Sig Sauer designed the safety lock so that even inadvertent

---

[32] Ibid.

[33] Products, Firearms, Pistols, P320, Sig Sauer, [https://web.https://web.archive.org/web/20170120053511/https://www.sigsauer.com/products/firearms/17hy17ol/p320] (archived Jan 20, 2017).

[34] Slatowski, 148 F.4th at 135.

pressure on the trigger can disengage it; the FBI's analysis found that the safety lock can disengage even through "movement and friction" alone.[35]

54.    The overwhelming number of civilian and law enforcement customers purchased (and continue to purchase) their P320s with no external safety.[36]

## II.    By 2017, Sig Sauer Was on Notice That a Loaded P320 Can and Does Fire Without Intentional Trigger Pulls.

### A.    Sig Sauer Becomes Aware of Drop-Safety Concerns.

55.    In 2015, the United States Army issued a public solicitation for bids for a contract to provide a Modular Handgun System for Army use.[37] The solicitation specified that all proposed handgun systems must have "an external safety mechanism," and clearly stated that "[s]ubmissions without [this] feature will not be considered for evaluation."

56.    In 2016, as part of the bidding process for the Army's Next Generation Module Pistol, the Army conducted sample tests on the Sig Sauer P320. The Army discovered during drop testing that "the striker struck the primer causing a discharge," and directed Sig Sauer "to correct this deficiency."[38]

57.    In February 2017, Sig Sauer prepared for the Army a failure modes and effects critical analysis ("FMECA").[39] Among other risks, the FMECA identified "unintentional

---

[35] FBI, supra n.21.

[36] See Barton & Jackman, supra n.9.

[37] Dep't of Def., Solicitation, Offer and Award: No. W15QKN-15-R-002 (August 28, 2015), at 340, para. M.3.1.3, https://tinyurl.com/2f4v4bux.

[38] Dep't of Def., XM17/XM18 Modular Handgun System (MHS), in FY 2017 Annual Report 134 (Jan. 2018), https://www.dote.osd.mil/Portals/97/pub/reports/FY2017/other/2017DOTEAnnual Report.pdf?ver=2019-08-19-113553-787.

[39] Rachel Fedeli, Court Records Reveal Sig Sauer Knew of Pistol Risks for Years, The Smoking Gun (Aug. 14, 2025), https://smokinggun.org/court-records-reveal-sig-sauer-knew-of-pistol-risks-for-years (linking to the FMECA).

discharges" from (a) "accidental trigger pull" due to a "foreign object," and (b) "impact to weapon (dropped, bumped, vibration)" as risks "likely to occur sometimes in the life of an item." Sig Sauer claimed to mitigate the risk of accidental trigger pulls by foreign objects by "guard[ing] the trigger to prevent snags" and incorporating the "manual safety [to] also further reduce[] the probability of occurrence." As to impact risk, Sig Sauer acknowledged that "without a manual safety, [the P320] failed [the Army's] drop testing."

58.     By April 2017, Sig Sauer implemented an Engineering Change Proposal to respond to the Army's concerns by implementing light weight components in the trigger group mechanism.

59.     The Army was satisfied and Sig Sauer was awarded a lucrative contract. Sig Sauer moved forward with production of two variants of the P320 that included an external manual thumb safety, dubbed the Sig Sauer M17 and M18.

60.     Sig Sauer used its military contract as a selling-point for the civilian and law enforcement markets, casting the U.S. military's choice to procure the M17 and M18 as an endorsement of the P320's safety. Sig Sauer advertised that the P320 was "chosen by all branches of the U.S. military."[40]

61.     But Sig Sauer did not mention in its advertisements that the U.S. military had not chosen the standard P320 marketed to civilians and law enforcement customers, but rather the customized M17 and M18 variants of the P320. Nor did Sig Sauer mention that the U.S. military only agreed to go forward with the procurement when Sig Sauer included on those variants an external safety that was not (and to this day is not) a standard feature on the overwhelming majority

---

[40] P320 Pistols, Sig Sauer, https://www.sigsauer.com/firearms/pistols/p320.html (last visited Oct. 15, 2025) ("Chosen by all branches of the U.S. military, as well as law enforcement agencies across the country and around the world, the P320 redefines the modern handgun.").

of the company's civilian and law enforcement P320s. Instead, Sig Sauer told the purchasing public that the military chose the P320 and that the P320 is safe without an external safety.

**B.    User Reports of Sig Sauer P320 Unintended Discharges Mount.**

62.    While Sig Sauer's internal testing and the U.S. Army's procurement process was underway, law enforcement and firearms professionals began to report more and more incidents in which P320s fired unintentionally.

63.    These incidents (and Sig Sauer's own parallel testing of the weapon) put Sig Sauer on early actual notice that a loaded P320 could fire, without the user pulling the trigger, in response to external forces, such as a drop, or even when a trained user made a routine movement with the gun holstered on their hip.

64.    For example, at Sig Sauer's own training academy in New Hampshire, two accidental discharges caused injuries in both 2016 and 2017.[41]

65.    In 2016, a tactical response training instructor near Sacramento, California "dropped his SIG Sauer, firing a bullet into a student's truck."[42]

66.    In February 2016, in Roscommon, Michigan, a fully holstered P320 discharged in its holster when the officer moved to exit his patrol vehicle.[43]

---

[41] Matt Gonzalez, A Gun's History of Accidental Discharges, S.F. Examiner (Jun. 16, 2022), https://www.sfexaminer.com/our_sections/forum/a-gun-s-history-of-accidental-discharges/article_22e31007-1904-5bad-956a-016aed663d7a.html.

[42] Ibid.

[43] Barton & Jackman, supra n.9.

67.    In Surprise, Arizona, the police department reported to Sig Sauer two separate incidents of P320s firing without trigger pulls in 2016.[44]

68.    In November 2016, in Holmes Beach, Florida, a police officer's P320 unintentionally fired, striking him in his leg.[45]

69.    That same month, a Tacoma, Washington resident was shot by his P320 while it was holstered.[46]

70.    In January 2017, a Stamford, Connecticut, SWAT team member had a P320 that shot him in the knee when the pistol dropped from his holster.[47]

71.    That same month, the Anoka County Sherriff's Department in Minnesota informed Sig Sauer that a deputy was shot by his holstered P320 while removing it from his belt.[48]

72.    In May 2017, in Georgia, an officer's P320 discharged inside his holster when he tripped and fell on his side.[49]

73.    In June 2017, a P320 again discharged without the user pulling the trigger, this time in Wilsonville, Oregon.[50]

---

[44] Compl. ¶ 60, Hall v. Sig Sauer, Inc., No. 3:23-cv-978 (M.D. Pa. Jun. 13, 2023) ECF No. 1; see also ; Compl. ¶ 74, Currington v. Sig Sauer, Inc., No. 1:25-cv-26 (D.N.H. Jan. 13, 2025), ECF No. 1 ("Currington Compl.")  (citing Sig Sauer's internal records of these incidents).

[45] Compl. ¶¶ 35–49, Powers v. Sig Sauer, Inc., No. 2020CA001741AX (Cir. Ct. Manatee Cnty. Fla. May 14, 2020).

[46] Compl. ¶¶ 2.1–2.10, Hoefs v. Sig Sauer, Inc., No. 3:20-cv-05173-RAJ (W.D. Wash. Feb. 26, 2020), ECF No. 1.

[47] Second Am. Compl. ¶¶ 5–15, Sheperis v. Sig Sauer, Inc., No. 3:17-CV-11318-JCH (D. Conn. June 4, 2018), ECF No. 60.

[48] Currington Compl., supra n.44, ¶ 74 (detailing an email sent from the Anoka County Sheriff's Department to a Sig Sauer "Regional Manager for Law Enforcement Sales").

[49] Ibid. (documenting Sig Sauer's notes following a call it received from the officer's department).

[50] Ibid. (citing Sig Sauer's internal records of these incidents); Pagliery, supra n.15.

74.     On June 20, 2017, a holstered P320 in possession of an officer of the Howell Township, New Jersey Police Department discharged when it was dropped. Following this incident, Sig Sauer swapped "all 125 of the police force's pistols" for new P320s—as if only one batch of P320s was defective.[51] A few years later, a second Howell Police officer was injured by another unintentional P320 discharge.[52]

75.     These are just some of the early examples of P320s firing when the user did not want them to that were known to Sig Sauer by 2017.

### III.    Sig Sauer Makes Minor Changes and Continues to Minimize the Unintended Discharge Problem.

76.     By 2017, Sig Sauer knew that the P320 was prone to unintended discharges, and knew that public awareness of that problem threatened its commercial business.

77.     Beginning in August 2017, Sig Sauer began a marketing campaign that acknowledged the drop safety problems and pledged to address them, but ignored the myriad reports of unintended discharge unrelated to drops.

78.     The marketing campaign began with an August 4, 2017 press release titled "Sig Sauer Reaffirms Safety of P320 Pistol." The press release acknowledged reports of drop safety problems, but claimed that "there have been zero (0) reported drop-related P320 incidents in the U.S. commercial market." (emphasis added). This statement elided the many drop-related incidents in other contexts, including that the P320 had failed the military's drop testing, as well as P320 unintentional discharge incidents that did not involve drops.

79.     The press release was subtitled "Striker-fired pistol exceeds safety standards of ANSI / SAAMI and U.S. military testing." But the U.S. military had refused to procure the P320

---

[51] Pagliery, supra n.15

[52] Ibid; see also Harp Compl., supra n.1, ¶¶ 165–75.

that Sig Sauer sold to law enforcement and commercial markets; it actually procured the M17 and M18 variants of the P320 that incorporated an external safety.

80.    Just four days later, on August 8, 2017, Sig Sauer backtracked by publicly acknowledging circumstances that could cause "unintentional discharge."[53] Soon thereafter, on its website, Sig Sauer stated that "additional testing" had "confirmed that usually after multiple drops, at certain angles and conditions, a potential discharge of the firearm may result when dropped," but still insisted that this was a "rare occurrence."[54] Sig Sauer did not offer a mandatory recall to address these issues, but instead announced a "voluntary upgrade" for existing P320.[55:]



**Why is this upgrade happening?**

Through additional testing above and beyond standard American National Standards Institute (ANSI)/Sporting Arms & Ammunition Institute (SAAMI), National Institute of Justice (NIJ), Department of Justice (DOJ), Massachusetts, California, and other global military and law enforcement protocols, we have confirmed that usually after multiple drops, at certain angles and conditions, a potential discharge of the firearm may result when dropped. Although it is a rare occurrence, with very specific conditions, SIG SAUER is offering an upgrade to all of its current P320 owners.

81.    The "voluntary upgrade" offered to "enhance[]" existing law enforcement and civilian P320s with internal modifications designed to reduce drop risk.

---

[53]    Sig Sauer Issues Voluntary Upgrade of P320 Pistol, Sig Sauer, [https://web.archive.org/web/20170915101213/https://www.sigsauer.com/press-releases/sig-sauer-issues-voluntary-upgrade-p320-pistol/] (archived Aug. 8, 2017).

[54]    P320 Voluntary Upgrade Program: Frequently Asked Questions, Sig Sauer, [https://web.archive.org/web/20170912034831/https://www.sigsauer.com/support/p320-voluntary-upgrade/] (archived Sept. 12, 2017).

[55]    This statement has remained on Sig Sauer's website. P320 Voluntary Upgrade Program: Frequently Asked Questions, Sig Sauer, https://www.sigsauer.com/p320-voluntary-upgrade-program (last visited Oct. 15, 2025).

82.    The voluntary upgrade program did not add any external safeties to the P320, which Sig Sauer's marketing continued to claim were unnecessary.

83.    Around the same time of the voluntary upgrade for existing P320s, Sig Sauer made similar changes to its newly manufactured P320s. According to Sig Sauer, all P320s manufactured after August 8, 2017 "already include[] the upgrade by default."[56]

84.    At all times, Sig Sauer's marketing characterized the reported discharge problems, and the reason for the upgrade, as related solely to improving the P320's drop safety issues, since a loaded handgun should be able to sustain a drop without firing. But this narrow characterization omitted, and failed to apprise the public of, the myriad reports of unintended firing unrelated to drops.

## IV.    Sig Sauer's "Voluntary Upgrade" Fails to Remedy the Harm to Law Enforcement and the Public.

85.    Over the next few years, stories about P320s firing when their users did not want them to continued to accumulate and were reported directly to Sig Sauer.

86.    Examples of personal injuries beginning in 2018 involve P320s of the original design, P320s that had been voluntarily upgraded, and P320s sold new with the features added as part of the voluntary upgrade:

a.    Incidents involving Sig Sauer P320s of the original design:

- On June 19, 2020, in Pennsylvania, an Army veteran was shot by a P320 while it was in his holster. He subsequently won a $1 million personal injury verdict against Sig Sauer and stated "[i]f I had known about this gun's problems, it would not have been the gun I carried."[57]

---

[56] Ibid.

[57] Compl. ¶¶ 24–33, Abrahams v. Sig Sauer, Inc., No. 220601213 (Phila. Cnty. Ct. C.P. June 14, 2022) ("Abrahams Compl."); Barton & Jackman, supra n.9.

b. Incidents involving Sig Sauer P320s of the original design that had been upgraded:

- On May 31, 2020, in Arizona, an Air Force veteran was shot by his P320.[58]

c. Incidents involving Sig Sauer P320s sold new with the upgraded new design:

- On December 11, 2018, in Georgia, a civilian was shot by his holstered P320 in front of his wife and son. He subsequently won a $2.35 million-dollar personal injury verdict against Sig Sauer.[59]

- On October 11, 2019, in New Jersey, a Department of Veterans Affairs police officer was shot while removing his holster (containing a P320) from his belt.[60]

- On February 12, 2022, in Virginia, a Navy veteran was shot by his P320 during a training session at a gun range while the gun was holstered.[61]

87.    At no point since 2017 has Sig Sauer made additional design changes, warned users of the unintended discharge risks unrelated to drops, or changed its overall message that the P320's innovative and safe design protects against discharges when the user does not intend to fire.

88.    The unintended firing problem has continued to recur. In New Jersey, communities have experienced the fear and injury caused by Sig Sauer P320s firing when the user did not want them to. The injuries have often been severe. At least one incident resulted in the death of an experienced police officer.

89.    The majority of these incidents have involved law enforcement, but civilians have been injured, too. The shock and trauma of unintended discharges extend beyond the person

---

[58] Compl. ¶¶ 15–19, Winingham v. Sig Sauer, Inc., No. 2:22-CV-1037-JJT (D. Ariz. Feb. 16, 2023), ECF No. 27.

[59] Compl. ¶¶ 7–14, Lang v. Sig Sauer, Inc., No. 1:21-CV-4196 (N.D. Ga. Oct. 11, 2021), ECF No. 1, Ex. B.

[60] See Murphy, supra n.5.

[61] See Am. Compl. ¶¶ 677–715, Armendariz v. Sig Sauer, Inc., No. 22-cv-536 (D.N.H. Mar. 13, 2023), ECF No. 28 ("Armendariz Am. Compl."); Barton & Jackman, supra n.9.

physically shot. Because not all incidents have been reported publicly, and because new injuries are constantly coming to light, Plaintiffs have reason to believe that the following examples represent just a subset of the total problem:

- In October 2019, Department of Veterans Affairs Police Officer Frank Kneski, then based in East Orange, was shot below his waist when his personal P320 unintentionally fired as he attempted to remove his holster and gun; he never touched the trigger, or even the gun directly.[62]

- In February 2021, an Essex County, New Jersey-based special agent of the Department of Homeland Security, Angelo Valentino, was injured by an unintentional P320 discharge while sitting in the passenger seat of a tow truck.[63]

- In November 2021, Detective James Scoppa of the Atlantic County Prosecutor's Office suffered severe tinnitus after a holstered P320 fired inside his car.[64]

- In February 2022, as described above, Officer Raymond Tillotson's holstered P320 discharged and fractured a bone in his right foot. This was the second Howell Township Police Department incident.[65]

- In March 2022, inside the locker room at the headquarters of the Phillipsburg Township, New Jersey Police Department, Officer Vincent Cicala's holstered P320 discharged onto the floor, causing him severe hearing damage.[66]

- In October 2022, civilian gun owner Nicola Bevacqua of Montville, New Jersey, racked his P320 by pulling back the slide, when the pistol suddenly and unexpectedly fired.[67]

---

[62] See Murphy, supra n.5.

[63] See Compl. ¶¶ 10-19, Valentino v. Sig Sauer, Inc., No. 23-cv-1309 (D.N.J. Mar. 8, 2023), ECF No. 1, Ex. B.

[64] See Armendariz Am. Compl., supra n.61, ¶¶ 302–09.

[65] See Harp Compl., supra n.1, ¶¶ 165–75.

[66] See id. at ¶¶ 176–83.

[67] See Bevacqua Compl., supra n.5, ¶¶ 173–79.

- In February 2023, Officer Gregory Willis of the West Orange, New Jersey Police Department, holstered his P320 and was shot in the thigh.[68]

- In April 2023, while cleaning his P320 service weapon at headquarters, Detective Lieutenant Walter Imbert of the Orange, New Jersey, Police Department suffered a fatal gunshot wound. Forensic evidence indicates he was holding his gun by its slide, with nothing on the trigger, when the P320 discharged.

- In August 2023, civilian gun owner Andrew Parisio of Parlin, New Jersey, was shot in his thigh and calf by his holstered P320.[69]

- In October 2024, while walking to his vehicle, Detective Mark Cunard of the Camden County Prosecutor's Office was shot in his thigh and knee by his holstered P320.[70]

90. The same pattern continues across the country:

- On May 2, 2023, in New Hampshire, a holstered P320 carried by an experienced firearm owner unintentionally shot him in in his thigh and foot.[71]

- On March 8, 2024, in Texas, a Harris County sheriff's officer was removing his holstered P320 from his pocket when the still-holstered P320 discharged and struck his leg near his pelvic area.[72]

- On May 9, 2024, in LaGrange, Texas, a police officer nearly bled to death after his P320 discharged into his leg while secured in its holster.[73]

- On September 24, 2024, in Marble Falls, Texas, a police officer was preparing to provide security at a school homecoming football game

---

[68] See Willis Am. Compl., supra n.3, ¶¶ 176–84.

[69] See Anderson Compl., supra n.4, ¶¶ 315–22.

[70] See id. at ¶¶ 224–30.

[71] Compl. ¶¶ 174–78, Weatherbee v. Sig Sauer, Inc., No. 218-2025-CV-569 (Rockingham Cnty. N.H. Super. Ct. May 12, 2025).

[72] Am. Compl. ¶¶ 38–47, Orrson v. Sig Sauer, Inc., No. 4:25-cv-1776 (S.D. Tex. July 14, 2025), ECF No. 14.

[73] Currington Compl., supra n.44, ¶¶ 90–99.

when his holstered P320 shot his thigh and knee. Students had to come to his aid before he was airlifted to the hospital.[74]

- On October 1, 2024, in Bucks County, Pennsylvania, a civilian with a P320 purchased in 2022 was shot in the groin, despite his gun being holstered at the time. He bled to death in the basement of his home. The family has since sued Sig Sauer for wrongful death.[75]

- On January 20, 2025, in Houston, Texas, a senior police officer was shot by his fully holstered P320 while he was directing traffic for holiday community events.[76]

- In August of 2025, in Puerto Rico, four new personal injury lawsuits, filed by four different police officers after unintended P320 discharges of guns purchased on or after 2018 were added to the growing docket of P320 cases in Puerto Rico (where the P320 is a common service weapon). In each case, the officer's gun was in its holster or being holstered when it shot him or her, including one officer who suffered gaping wounds in front of his wife and child.[77]

91.    Videotapes of such incidents are accumulating, too. Video after video shows, and witness after witness has described, the Sig Sauer P320 firing during routine usage by users making routine movements consistent with ordinary care.[78]

**V.    Law Enforcement Agencies Recognize the Danger and Discontinue Use.**

92.    A growing number of police forces around the country, including major metropolitan forces, have been removing and replacing their Sig Sauer P320 service weapons

---

[74] Id. at ¶¶ 100–08.

[75] Gomelskaya Compl., supra n.18, ¶¶ 82–97.

[76] Compl. ¶1, ¶27, Fernandez v. Sig Sauer, Inc., No. 4:25-cv-4007 (S.D. Tex. Aug. 25, 2025), ECF No. 1-3 (explaining the Sig Sauer P320 was purchased in or around December 2022).

[77] See Compl. ¶¶ 17–32, Lampon v. Sig Sauer, Inc., No. 3:25-cv-01410 (D.P.R. Aug. 1, 2025); Compl. ¶¶ 15–30, Ortiz Perez v. Sig Sauer, Inc., No. 3:25-cv-01423 (D.P.R. Aug. 8, 2025); Compl. ¶¶ 14–32, Quiñones Colon v. Sig Sauer, Inc., No. 3:25-cv-01425 (D.P.R. Aug. 8, 2025); Compl. ¶¶ 16–32, Torres Cruz v. Sig Sauer, Inc., No. 3:25-cv-01424 (D.P.R. Aug. 8, 2025).

[78] See, e.g., CBS Austin, "It Just Went Off": Texas Officers Sound Alarm on SIG SAUER's P320 Pistol, (YouTube, Sept. 15, 2025), https://www.youtube.com/watch?v=UjgyyA5MVgc.

(regardless of when they were bought or if they were "upgraded"), usually at the department's own

considerable expense and despite the time and effort needed to retrain thousands of police officers.

93.    As just some of the many examples around the country:

    a.    In August 2019, a Southeastern Pennsylvania Transportation Authority ("SEPTA") Transit Officer's holstered P320 unintentionally discharged. After the video of the incident showed that there was no trigger pull, SEPTA replaced all Sig Sauer P320s in its arsenal.[79]

    b.    In 2021, the Pasco County Sheriff's Office in Florida discontinued use of the Sig Sauer P320 as a service weapon after two officers survived leg injuries caused by unintended discharges; a third discharge which did not result in injury occurred in a school cafeteria.[80]

    c.    In October 2022, the Milwaukee Police Department replaced its Sig Sauer P320s with weapons from another manufacturer after experiencing three unintended discharges in three years.[81]

    d.    In July 2023, the town of Montville, Connecticut was one of multiple Connecticut municipalities who removed the Sig Sauer P320 as a service weapon following the investigation of an incident captured on video, in which neither the officer nor the suspect had his hands near the trigger when the gun fired.[82]

---

[79] See, Murphy, supra n.5.

[80] See Barton & Jackman, supra n.9.

[81] Ava Sasani & Champe Barton, A Gun Deemed Too Dangerous for Cops, But Fine for Civilians, Reveal (May 19, 2025), https://revealnews.org/article/sig-sauer-p320-police-resale-public.

[82] This incident was captured on security camera and body camera, both angles show the officer's hands were occupied and not near the holstered Sig Sauer P320 at the time of discharge. See The Day, Montville Police Officer's Handgun Went Off Inside the Montville Police Department, (YouTube, July 26, 2023), https://www.youtube.com/watch?v=OSAI_HUZDI0. See also Michael Gagne, Some Connecticut Police are Replacing a Handgun that can Reportedly Fire Without Being Triggered, Newstimes (Apr. 30, 2024, 16:39 ET), https://www.newstimes.com/local/article/ct-police-sig-sauer-guns-safety-19404483.php.

e.  In July 2024, the Sheriff's Office in Bexar County, Texas prohibited use of the Sig Sauer P320. One year later, the San Antonio Police Department suspended its use of the P320.[83]

f.  In October 2024, following an unintentional discharge at a firearm instruction course at the Washington State Criminal Justice Training Commission ("WSCJTC"), the WSCJTC prohibited Sig Sauer P320s from use.[84] The Oregon Department of Public Safety Standards and Training then also prohibited P320s from use after reviewing WSCJTC's report.[85] Sig Sauer has sued them for doing so.[86]

g.  In April 2025, the Denver Police Department pulled the Sig Sauer P320 from its approved handgun list after the "P320 was found to no longer meet the internal safety standards of the Denver Police Department."[87]

h.  In June 2025, the Houston Police Department banned the Sig Sauer P320 following a lawsuit from an officer who was injured when his P320 discharged while he directed traffic ahead of a parade.[88]

i.  In 2025, the 11,600 sworn officers of the Chicago Police Department were told they had until July 14, 2025 to submit proof they had replaced their Sig Sauer P320s

---

[83] David Lynch, SAPD is Suspending Use of the Sig Sauer P320 Handgun. Here's Why, KENS5 (July 29, 2025, 15:37 CT), https://www.kens5.com/article/news/local/law-enforcement/sig-sauer-p320-safety-san-antonio-police-sapd-texas/273-698b04f6-61de-4944-868f-8d293773de1f.

[84] See Washington State Criminal Justice Training Commission, Sig Sauer P320 Pistol Report 4 (Feb. 2025), https://cjtc.wa.gov/sites/default/files/2025-02/Sig%20Sauer%20P320%20Report%20February%202025.pdf;

[85] Isabel Funk, Oregon Police Academy Bans Popular Handgun from Use Amid Safety Concerns, Salem Statesman Journal (July 1, 2025, 4:01 PT), https://www.statesmanjournal.com/story/news/local/oregon/2025/07/01/oregon-public-safety-academy-bans-sig-sauer-p320-handgun/84386016007.

[86] Chris Ingalls, Gun Maker Sues to Block Washington's Police Academy Ban on Sig Sauer P320s, KGW8 (July 24, 2025, 20:29 PT), https://www.kgw.com/article/news/investigations/gun-maker-sues-to-block-washington-police-academy-ban-sig-sauer-p320s/281-77f3b16e-39fc-42a1-8e7c-bff999d86e43; Joanna Putman, Sig Sauer Sues Oregon Police Training Board over P320 Ban, Police1 (Aug. 22, 2025 12:20 ET), https://www.police1.com/firearms/sig-sauer-sues-ore-police-training-board-over-p320-ban.

[87] Sasani & Barton, supra n.81.

[88] See, e.g., Matt deGrood, Houston Police Department Bans Popular Pistol Cited in Officer's Injury Lawsuit, Houston Chronicle (Aug. 4, 2025) (reporting around 1,200 officers have a Sig Sauer P320 registered with the Houston Police Officers Union), https://www.houstonchronicle.com/news/houston-texas/article/sig-sauer-hpd-ban-20801028.php.

with a new approved service weapon; because officers in Chicago must purchase their own service weapon, the City is scrambling to try to defray these personal costs.[89] As of October 2025, a federal judge ordered that officers still in possession of the P320 should be required immediately to use an alternative weapon.[90]

j.   In July 2025, New Jersey State Police removed the Sig Sauer P320 from approved off-duty weapons based on their review of the FBI report and their understanding about nationwide incidents that have resulted in injuries and even death.

k.   In August 2025, San Francisco's Police Department stopped using the Sig Sauer P320, and officers for the San Francisco International Airport police replaced their P320s.[91]

94.   For some of the many cities and towns who have discontinued using the Sig Sauer P320, the decision was made in light of the volume of news stories about accidental discharges, often coupled with demands from police officers or their unions concerned about officer safety. But more often than not, what directly precipitated a police force's decision to stop using the Sig Sauer P320 was an accidental discharge (or three,[92] or four[93]) within their own department.

---

[89] Frank Main, Chicago Cops have Stopped Using Sig Sauer Handgun Dogged by Safety Concerns, Chicago Sun Times (Aug. 11, 2025, 14:13 ET), https://chicago.suntimes.com/the-watchdogs/2025/08/11/chicago-police-cpd-gun-sig-sauer-p320-safety-snelling-catanzara-news.

[90] Judge Demands to Know How Many CPD Officers Carry Gun Tied to Misfire Claims, 5Chicago (Oct. 7, 2025, 10:38 ET), https://www.nbcchicago.com/investigations/judge-demands-to-know-how-many-cpd-officers-carry-gun-tied-to-misfire-claims/3834618/.

[91] Jonah Owen Lamb, SFPD to Replace Pistols Said to Fire Without the Trigger Being Pulled, The S.F. Standard (Aug. 15, 2025, 6:00 ET), https://sfstandard.com/2025/08/15/sfpd-guns-sig-sauer-malfunction.

[92] Sasani & Barton, supra n.81 (noting that the Milwaukee Police Department experienced three unintended discharges before replacing the service weapon); Barton & Jackman, supra n.9 (finding that the Pasco County Sheriff's Office in Florida replaced their service P320s after the third unintended discharge incident).

[93] See Officer's Gun that Fired Inside Massachusetts School, supra n.7 (reporting the fourth Sig Sauer P320 unintended discharge in Cambridge, Massachusetts since its adoption as the department's service weapon).

95.     For the early law enforcement victims, these injuries were often accompanied by unwarranted shame and professional embarrassment. Officers were often presumed to have caused the problems through their own incompetence until (a) video evidence emerged clearing the injured officer's name and reputation, (b) other officers experienced similar P320 discharges within the same department, and/or (c) the national story made it unmistakable that the problem lay with the P320, not with them.  In Pasco County, Florida, for example, the sheriff whose gun discharged in a school cafeteria had his career "ruined;" he found little solace when the department finally recognized that the problem was the Sig Sauer P320, but only after two of his colleagues had similar experiences.[94]

96.     The delay before a law enforcement department, the public, and the press understand that responsibility for an incident lies with Sig Sauer, and not the officer, can be personally and professionally devastating. An Assistant District Attorney in Georgia experienced this when his Sig Sauer P320 unintentionally discharged in a courthouse, leading to a flurry of tabloid news stories.[95] In New Jersey, this kind of professional humiliation has been a painful part of the experience for victims and their families in the aftermath of a P320 unintended discharge.

## VI.    On Notice of Mounting Liability, Sig Sauer Obtains Special Legislative Immunity in its Home State.

97.     As the intended discharge incidents mounted, injured users and their families successfully sought redress in court against Sig Sauer for unintended P320 discharges. But rather

---

[94] Barton & Jackman, supra n.9.

[95] Ibid; Bob D'Angelo, Georgia Assistant District Attorney Accidentally Shoots Himself Inside Courtroom, Fox23 News (Apr. 24, 2022), https://www.fox23.com/news/trending/georgia-assistant-district-attorney-accidentally-shoots-himself-inside-courtroom/article_dac1d643-45d0-52ec-9887-0cc8c67d9a58.html.

than address the design issues at the root of the problem, Sig Sauer lobbied the legislature of the New Hampshire, where it is headquartered, for immunity.

98.    In May 2025, New Hampshire enacted House Bill 551, a law that news outlets dubbed the "Sig Sauer immunity law," which bars products liability lawsuits in that state against firearm industry participants based on the presence or absence of an external safety (among other reasons not relevant here).[96]

99.    The legislation became law over the objections of law enforcement officials across the country, who had urged New Hampshire to "reject proposals that seek to grant immunity" to the whole firearms industry "based on a single manufacturer's request and based on a single gun— the P320 pistol—that has placed law enforcement officers and the general public at risk and unnecessarily harmed many."[97]

**VII.    Sig Sauer's Post-Upgrade Marketing Still Denies the Problem, Blames the Victims, and Continues to Mislead and Deceive the Public About the P320's Safety from Unintended Discharge.**

100.    As the adverse court findings against Sig Sauer's defective design of the P320 piled up and the company felt the need to obtain a legislative shield against liability, Sig Sauer's website, social media, and marketing materials painted a radically different picture. A consumer perusing those company sources up to this day would only find denials that the P320 poses a particular danger for users; statements deflecting accountability; misleading and false representations about the P320's safety from unintended discharge; and a consistent narrative that the P320 is, against all evidence, "the most operator-safety focused" handgun.[98]

---

[96] Facing a Wave of P320 Lawsuits supra n.23; see 2025 N.H. H.B. 551(enacted as N.H. Stat. Ann. § 507-D:6).

[97] Landrigan, supra n.22.

[98] See infra at I.B and related footnotes.

A. **Under the Guise of Presenting "The Truth About the P320," Sig Sauer's Marketing Misleads and Deceives the Public About the P320's Operation Under Ordinary Use Conditions.**

101. In response to the mounting injuries and lawsuits, Sig Sauer has made a series of public statements designed to assure customers and users that there was no risk of the P320 firing when the user did not want it to fire.

102. Since the allegations of unintended discharges by the P320 became public, Sig Sauer sought to reassure the public by offering statements about the handgun's safety.

103. From at least 2017 to 2019, the product webpage for the P320 put it in explicit terms: "From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to."[99]

104. Both the pre-2019 and post-2019 statements mislead and deceive the public about the safety of the P320's operations under ordinary use conditions.

105. For example, on March 7, 2025, Sig Sauer released a press release and marketing content purporting to offer "Truth" about the P320, which were posted to the company's website and official accounts on Facebook, Instagram, and X.[100]  The centerpiece of this messaging campaign was a categorical, bold statement: "The P320 CANNOT, under any circumstances,

---

[99] Meet the P320, Sig Sauer, (emphasis added) [https://web.archive.org/web/20190127115552/ https://www.sigsauer.com/edu/meet-the-p320] (archived Jan. 27, 2019); see supra Part I, ¶14.

[100] SIG SAUER (@sigsauerinc), Instagram, The P320. It ends today., (Mar. 7, 2025), https://www.instagram.com/p/DG6RkWCpkdw; SIG SAUER, (@Sig SAUER), Facebook, The P320. It ends today., (Mar. 7, 2025), https://www.facebook.com/SigSAUERInc/posts/the-p320-it-ends-today/1088321759995058; SIG SAUER (@sigsauerinc), X (formerly known as Twitter), The P320. It ends today., (Mar. 7, 2025), https://x.com/sigsauerinc/status/1898099442172989921 ?lang=en.

discharge without a trigger pull – that is a fact." In the version of that marketing copy that was posted to social media, that sentence was underlined for emphasis.[101]



106.    These unequivocal statements have the capacity to mislead and deceive reasonable consumers into falsely believing that it is impossible for the P320 to discharge without a "trigger pull," i.e., a user's voluntary act to pull the trigger and fire.

107.    And in its 2025 campaign, Sig Sauer doubled down on the assertion that it is a "fact" that the P320's internal safeties prevent discharge "unless the trigger is deliberately pulled."[102] (emphasis added). The reference to "deliberate[]" action confirmed that, despite

---

[101] Ibid.

[102] Learn the Facts, Sig Sauer: P320 Truth.Com, https://www.sigsauer.com/p320-truth (last visited Oct. 15, 2025).

wording changes, Sig Sauer was still insisting that the P320 would not fire unless the user wanted

it to do so.



LEARN THE FACTS

Fact #4
The P320's trigger safety mechanism prevents discharge unless the trigger is deliberately pulled.

108.    Along the same lines, Sig Sauer's March 7, 2025 press release also categorically

asserted that "it is not possible for the P320 to discharge unless the trigger is fully actuated."

109.    These statements tended to mislead or deceive reasonable consumers into falsely

believing that anything short of a "full" pull of the trigger would not and could not result in the

gun firing. But that, too, was contradicted by the experience of numerous Sig Sauer customers,

both law enforcement and civilian, in New Jersey and across the Nation, of which Sig Sauer had

knowledge. It is also contrary to even the intended design of the gun: the trigger is designed to

disable the critical safety lock after moving a shorter distance than is required for the trigger to

release the striker.  In other words, the pivotal safety is designed to be disabled by less than a "full"

pull.

110.    Sig Sauer's categorical statements were unconscionable, misleading, deceptive and

unreasonable, violated New Jersey law, and endangered the New Jersey public by misleading

consumers about the P320's capacity to unintentionally discharge and assuring consumers that the

Sig Sauer P320 could not unintentionally fire during ordinary, responsible use and handling. Those

assurances played a role in consumers' decision to purchase and carry a P320 instead of another

handgun that was less prone to unintended discharge, and they also influenced the purchasers' decision about whether to employ special precautions and care when handling the P320 as compared to other handguns.

111.    As reports of people shot by their own P320s continued to mount, Sig's messaging changed, becoming more strident in tone, yet more evasive in substance.

112.    Sig Sauer issued a blog post, dated almost five months later, that contained slightly different formulations of its false assurances. The post in question, published at the end of July 2025, aimed to respond to recent revelations about the FBI's findings on the P320.

113.    Under the title "P320 Information," Sig Sauer claimed that "[t]he P320 CANNOT, under any circumstances, discharge without the trigger first being moved to the rear." [103]

114.    This modified statement is still misleading and deceptive: a consumer would reasonably have understood that a trigger "being moved" to the rear requires that someone do the moving—that is, that firing the gun requires deliberate action on the trigger. But the FBI's own testing had already shown at that point that the P320 could fire from "movement and friction" alone, without any pressure on the trigger, and testing from lawsuits against Sig Sauer confirmed that the P320 did fire without the trigger being moved to the rear.[104]

115.    Sig Sauer also stopped short of stating that unintended discharges were impossible, instead stating that "no one, including plaintiff 'experts'" had "been able to replicate a P320 discharging without a trigger pull."[105] But that, too, was deceptive and misleading. For example,

---

[103]    P320 Safety Information, Sig Sauer: Company News (July 29, 2025), https://www.sigsauer.com/blog/p320-information.

[104]    See supra Part I ¶¶ 47, 54 and related footnotes.

[105]    FAQs, Sig Sauer: P320 Truth.Com, https://www.sigsauer.com/p320-truth (last visited Oct. 15, 2025).

the FBI's findings that the blog post supposedly addressed found that "with movements representing those common to a law enforcement officer it is possible to render [the P320's key internal safety] inoperable and ineffective at preventing the striker from impacting a chambered round," causing a discharge.[106]

116.    Consumers of firearms reasonably expect that firearms contain safety mechanisms and redundancies to help prevent unintended discharge. Such safety features are material to firearm consumers.

**B.    Sig Sauer Shifts Blame to Victims and Misleads Consumers About the Ongoing Litigation Related to Unintended Discharges.**

117.    Rather than accept responsibility for its role in the public safety crisis created by P320 unintended discharges, Sig Sauer, in its most recent marketing campaign, blames victims.

118.    Among other things, Sig Sauer has claimed that:

- "The allegations against the P320 are nothing more than individuals seeking to profit or avoid personal responsibility."[107]

- "Claims that unintended discharges are anything more than negligent handling and/or manufactured lies to support an anti-gun, anti-Sig agenda are false."[108]

- "The rhetoric is high, and we can no longer stay silent while lawsuits run their course, and clickbait farming, engagement hacking grifters continue their campaign to highjack the truth for profit. Enough is enough."[109]

- "Lawsuits with claims that the P320 is capable of firing without a trigger pull have been dismissed in twelve (12) separate federal

---

[106] See supra Part I ¶¶ 47, 54 and related footnotes.

[107]    The Truth About the Sig P320, Sig Sauer, [https://web.archive.org/web/20250313230323/https://www.sigsauer.com/p320-truth] (archived Mar. 13, 2025).

[108] Ibid.

[109] Ibid.

district courts, including a decision by a unanimous eight-person (8)
jury. In addition, five (5) other lawsuits against Sig regarding the
P320 with different liability theories have also been dismissed."[110]

119.    Moreover, Sig Sauer's dedicated "P320 Truth" website includes a side-by-side

comparison of "Fact vs. Fiction" that purports to summarize "a battle against biased and agenda-

driven parties" and address "misinformation [that] causes confusion and uncertainty among our

valued customers."  In that section, Sig Sauer characterizes the claim that "[t]he P320 has a design

flaw making it unsafe" as "Unproven" and juxtaposes it with Sig Sauer's assertions about the

safety of the P320's design.



120.    Taken together, these statements create the false impression that products liability

lawsuits against Sig Sauer have been based on profit- or agenda-driven fabrications and that such

litigation has been unsuccessful to date.

121.    In reality, the lawsuits against Sig Sauer have been supported by a factual record

developed by experts that found, in multiple instances, that the P320 can discharge without a user's

_____

[110] FAQs, Sig Sauer: P320 Truth.Com, https://www.sigsauer.com/p320-truth (last visited Oct. 15,
2025).

trigger pull—including from "movement and friction" alone. In addition, such claims are supported by the FBI's evaluation. And despite Sig Sauer's attempts to blame the victims, several victims have been vindicated in court on their theory that a design defect caused their injuries.

122.    In at least two cases, courts entered judgments against Sig Sauer on the plaintiffs' product liability claims, after juries found that the P320 was defectively designed and the design defect caused the plaintiffs' injuries. That contradicts another so-called "TRUTH" that Sig Sauer had proclaimed on its website: "Verified incidents of unintended discharges are all attributed to improper handling, incompatible equipment (i.e. holsters), trigger access vulnerability, or a lapse in firearm safety, not to any defect in the P320."[111]  In reality, two juries rightfully "attributed" those discharges to Sig Sauer's actions.



CLAIM:
There are numerous incidents of unintended discharges.

TRUTH:
Verified incidents of unintended discharges are all attributed to improper handling, incompatible equipment (i.e. holsters), trigger access vulnerability, or a lapse in firearm safety, not to any defect in the P320.

C.    **Sig Sauer Continues to Falsely Claim That the U.S. Military Endorses the P320 That It Refused to Procure Due to Concerns about Unintended Discharges.**

123.    To this day, Sig Sauer's product brochure for the P320 begins with the words "Chosen by the U.S. Military." Its second page describes the P320 as "The Official Sidearm of the U.S. Military," and says that "the P320 was selected" for procurement "in 2017, after one of the most rigorous and highly competitive military reviews in history." Other Sig Sauer marketing also implies that the U.S. military "tested and abused" the P320 before the handgun was "[c]hosen by

---

[111] See supra Part II.B, IV, and V along with related footnotes.

all branches of the U.S. military, as well as law enforcement agencies across the country and around the world."[112]



> **TESTED AND ABUSED**
>
> With its unmatched modularity, unprecedented accuracy, and uncompromising reliability, the state-of-the-art SIG SAUER P320 has quickly become one of the most sought after firearms on the market today. Chosen by all branches of the U.S. military, as well as law enforcement agencies across the country and around the world, the P320 redefines the modern handgun.
>
> **SAFETY WITHOUT COMPROMISE**
>
> Safety isn't negotiable. The P320 maximizes peace of mind with a robust safety system including both a striker safety and a disconnect safety, and because of its innovative 3-point takedown safety, never again will you need to pull the trigger to disassemble your pistol.
>
> **THE MOST TESTED AND PROVEN SIDEARM EVER**

124. These claims are false. The P320 as it is most frequently sold to law enforcement and civilian customers (and is it is being marketed here) is not what was selected as the official sidearm of the U.S. Military. The U.S. Military expressly rejected the original P320 because, among other reasons, it lacks an external safety. The U.S. Military in fact chose the M17 and M18 variants as its official sidearm, which are handgun models based upon the P320 but modified to add the external safety that Sig Sauer claims is "unnecessary" for its law enforcement and civilian customers. Of course, it is not unusual or objectionable for the military to procure equipment that is similar to civilian equipment but modified to suit military needs. These statements deceive and mislead Sig Sauer's customers into believing that a sophisticated customer, like the U.S. Military, found the P320 adequate when it in fact demanded significant modifications to address the same

---

[112] <u>P320 Pistols</u>, Sig Sauer, https://www.sigsauer.com/firearms/pistols/p320.html (last visited Oct. 15, 2025).

risk of unintended discharges that poses a public safety threat to the general public and to law enforcement.

**D.    Sig Sauer Has Not Warned Users of the Unique Risks of Unintended Discharge that the P320s Pose.**

125.    In continuing to sell P320s, Sig Sauer has not been honest with its users, nor has it apprised them of the nature of the risks that the P320 presents.

126.    Had users received appropriate warnings regarding the circumstances and frequency of the Sig Sauer P320's unintended discharges, consumers—including law enforcement agencies—could have chosen not to purchase P320s or at least sought customization that included an external safety.

127.    As stated by one Army veteran shot by his own Sig Sauer P320 (who subsequently won a trial verdict for damages against Sig Sauer): "[i]f I had known about this gun's problems, it would not have been the gun I carried."[113] A New Jersey victim similarly told the Attorney General: "Had I known that my Sig Sauer P320 was prone to discharging unintentionally, I would never have purchased it."

128.    Sig Sauer's design in particular warranted overt warnings to users because Sig Sauer's marketing materials, see, e.g., supra ¶¶ 13–15, would reasonably lead even experienced users and customers to conclude that the P320 was safe from unintended discharge without needing additional safety features.

---

[113] Abrahams Compl., supra n.57, ¶¶ 24–33; Barton & Jackman, supra n.9.

## VIII.    Sig Sauer's Ongoing Conduct Harms New Jersey and Its Residents.

129.    The Sig Sauer P320 sold in New Jersey is not safe for users and those around them. During routine carrying, holstering, un-holstering, cleaning, racking, and handling, Sig Sauer P320s fire when the user does not want them to.

130.    Beyond all of the obvious dangers and harms to the victims who may be injured in an unintentional discharge, the Sig Sauer P320s create additional costs and burdens on New Jersey institutions. When municipalities place wounded officers on paid leave, or replace officers who have been killed by an unintentional discharge from their Sig Sauer P320, New Jersey citizens bear those costs. Sig Sauer does not reimburse cities and towns for the costs of replacing their Sig Sauer P320s with other service weapons, nor for the costs to retrain officers. New Jersey citizens bear these costs, too. The State also incurs costs in responding to[114] and investigating Sig Sauer P320 discharges. Addressing the risks of Sig Sauer P320s that have a propensity to unintentionally fire at any time, at any place, at any user, or at any bystander, has imposed and will continue to impose significant costs on New Jersey.

131.    By continuing to make and distribute for sale a handgun that shoots its own users (and others around them) when the user does not want to fire, by failing to warn users of this fact, and by affirmatively marketing the gun as safe from unintended discharge, Sig Sauer has created an unreasonable threat to New Jersey public safety.

---

[114] For example, the second unintended discharge among Howell Township Police officers occurred at the State Police's Training facility in Sea Girt, New Jersey, requiring an emergency response. Thus, even New Jersey State Troopers—who do not typically carry P320 as their service weapons—are at risk of being unintentionally shot when interacting (at gun ranges or anywhere else) with any municipal police officers who still carry P320s.

## CAUSES OF ACTION

### Count One

### Violation of N.J.S.A. 2C:58-35(a)(1)
### Contributing to Public Nuisance by Unreasonable Conduct
### (Manufacturing, Distributing, and Selling Unsafe P320s)

132.    The Attorney General repeats and realleges the foregoing allegations as if set forth in their entirety herein.

133.    The Attorney General brings this count pursuant to N.J.S.A. 2C:58-35.

134.    Under Section 58-35(a)(1) "[a] gun industry member shall not, by conduct [] unreasonable under all the circumstances . . . , knowingly or recklessly create, maintain, or contribute to a public nuisance in this State through the sale, manufacturing, distribution, importing, or marketing of gun-related product."

135.    Sig Sauer is a "gun industry member" under Sections 58-34 and 58-35.

136.    The Sig Sauer P320 handguns described herein are "gun-related product[s]" under Sections 58-34 and 58-35.

137.    Defendant's conduct in manufacturing, distributing, and/or selling Sig Sauer P320 handguns in New Jersey is unreasonable under the circumstances described herein. See N.J.S.A. 2C:58-35(a)(1).

138.    Defendant's unreasonable conduct has knowingly or recklessly created, maintained, or contributed to a public nuisance within the meaning of Sections 58-35(a)(1) and 58-34, the latter of which defines a public nuisance to mean "any condition which injures, endangers, or threatens to injure or endanger or contributes to the injury or endangerment of the health, safety, peace, comfort, or convenience of others or which otherwise constitutes a public nuisance under common law."

139.    Defendant's violation of Section 58-35(a) entitles the Attorney General to "an injunction prohibiting [Defendant] from continuing that conduct or engaging therein or doing any acts in furtherance thereof." N.J.S.A. 2C:58-35(b). Such injunctive relief is necessary here to prevent further, continuing, and irreparable injury.

140.    The Attorney General is also entitled to an order providing for abatement of the nuisance by Sig Sauer, and to an order providing for restitution, including disgorgement of profits.

141.    The Attorney General is further entitled to recover damages, reasonable attorneys' fees, filing fees, reasonable costs of suit, and any other appropriate relief. See N.J.S.A. 2C:58-35(b).

142.    Defendant's unlawful actions and/or omissions were undertaken with actual malice or accompanied by wanton and willful disregard of persons who foreseeably might be harmed by those actions or omissions, within the meaning of the Punitive Damages Act, N.J.S.A. 2A:15-5.12. Defendant is therefore liable for punitive damages.

### Count Two

**Violation of New Jersey Product Liability Act (N.J.S.A. 2A:58C-2)**
**(Product Design and/or Manufacturing Defect)**

143.    The Attorney General repeats and realleges the foregoing allegations as if set forth in their entirety herein.

144.    The Attorney General brings this count pursuant to N.J.S.A. 2A:58C-2.

145.    Sig Sauer designed, manufactured, assembled, marketed, advertised, distributed and sold Sig Sauer P320 handguns that are defective as sold because they fire and shoot the user or bystanders when the user does not intend to fire.

146.    A Sig Sauer P320 that can so easily unintentionally fire is not "reasonably fit, suitable, or safe" for use, whether because (a) it deviated from the design specifications or

performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications, or (b) was designed in a defective manner. See N.J.S.A. 2A:58C-2.

147. The Sig Sauer P320's propensity to unintentionally fire existed when the product left Sig Sauer's control.

148. Sig Sauer has long known of this defective condition.

149. It is practically and technically feasible to design and manufacture handguns that are not prone to unintended discharge. In any event, handguns that are prone to unintended discharge are egregiously unsafe or ultra-hazardous; the ordinary user or consumer of the Sig Sauer P320 cannot reasonably be expected to have knowledge of its risks; and the Sig Sauer P320 poses a risk of serious injury to persons other than the user or consumer.

150. Sig Sauer's P320s have proximately caused harm to the State and its residents. This harm was foreseeable to Sig Sauer, and in fact was foreseen by Sig Sauer.

151. The Attorney General seeks an injunction prohibiting Sig Sauer from continuing that conduct or engaging therein or doing any acts in furtherance thereof.

152. The Attorney General is further entitled to recover damages.

153. Defendant's unlawful actions and/or omissions were undertaken with actual malice or accompanied by wanton and willful disregard of persons who foreseeably might be harmed by those actions or omissions, within the meaning of the Punitive Damages Act, N.J.S.A. 2A:15-5.12. Defendant is therefore liable for punitive damages.

## Count Three

### Violation of New Jersey Product Liability Act (N.J.S.A. 2A:58C-2)
### (Failure to Warn)

154.    The Attorney General repeats and realleges the foregoing allegations as if set forth in their entirety herein.

155.    The Attorney General brings this count pursuant to N.J.S.A. 2A:58C-2.

156.    Sig Sauer designed, manufactured, assembled, marketed, advertised, distributed and sold Sig Sauer P320 handguns that are defective as sold because they failed to contain adequate warnings or instructions concerning their propensity to unintentionally fire under ordinary use.

157.    Sig Sauer knew of the need for warnings no later than 2017 and could have provided them to customers and users.

158.    The tendency of the Sig Sauer P320 to unintentionally fire under ordinary use was an unknowable and unacceptable danger to the average or ordinary consumer, and/or a reasonable person would conclude that the probability and seriousness of the harm caused by the product outweighed the burden or costs of taking precautions.

159.    Sig Sauer's failure to warn users has proximately caused harm to the State and its residents.

160.    It was foreseeable to Sig Sauer that New Jersey and its residents would be harmed by Sig Sauer's failure to warn users.

161.    The Attorney General seeks an injunction prohibiting Sig Sauer from continuing to distribute or sell P320s to New Jersey without appropriate warnings.

162.    The Attorney General is further entitled to recover damages.

163.    Defendant's unlawful actions and/or omissions were undertaken with actual malice or accompanied by wanton and willful disregard of persons who foreseeably might be harmed by

those actions or omissions, within the meaning of the Punitive Damages Act, N.J.S.A. 2A:15-5.12. Defendant is therefore liable for punitive damages.

## Count Four

### Violation of N.J.S.A. 2C:58-35(a)(1)
### Contributing to Public Nuisance by Unlawful Conduct
### (Manufacturing, Distributing, and Selling P320s in Violation of Product Liability Act)

164.    The Attorney General repeats and realleges the foregoing allegations as if set forth in their entirety herein.

165.    The Attorney General brings this count pursuant to N.J.S.A. 2C:58-35.

166.    Under Section 58-35(a)(1), "[a] gun industry member shall not, by conduct [] unlawful in itself . . . , knowingly or recklessly create, maintain, or contribute to a public nuisance in this State through the sale, manufacturing, distribution, importing, or marketing of a gun-related product."

167.    Sig Sauer's conduct has been "unlawful in itself."  Sig Sauer has violated the New Jersey Products Liability Act, N.J.S.A. 2A:58C-2, as described above in connection with Counts Two and Three.

168.    Sig Sauer's unlawful conduct in violation of the New Jersey Products Liability Act has knowingly or recklessly created, maintained, or contributed to a public nuisance within the meaning of Section 58-35(a)(1).

169.    Sig Sauer's violation of Section 58-35(a) entitles the Attorney General to "an injunction prohibiting [Sig Sauer] from continuing that conduct or engaging therein or doing any acts in furtherance thereof."  N.J.S.A. 2C:58-35(b). Appropriate injunctive relief is necessary here to prevent further, continuing, and irreparable injury.

170.    The Attorney General is likewise entitled to abatement and restitution, including disgorgement of profits.

171.    The Attorney General is further entitled to recover damages, reasonable attorneys' fees, filing fees, reasonable costs of suit, and any other appropriate relief. See N.J.S.A. 2C:58-35(b).

172.    Sig Sauer's unlawful actions and/or omissions were undertaken with actual malice or accompanied by wanton and willful disregard of persons who foreseeably might be harmed by those actions or omissions, within the meaning of the Punitive Damages Act, N.J.S.A.2A:15-5.12. Sig Sauer is therefore liable for punitive damages.

### Count Five

**Violation of N.J.S.A. 2C:58-35(a)(1)**
**Contributing to Public Nuisance by Unreasonable Conduct**
**(Unreasonable Marketing of P320s)**

173.    The Attorney General repeats and realleges the foregoing allegations as if set forth in their entirety herein.

174.    The Attorney General brings this count pursuant to N.J.S.A. 2C:58-35.

175.    Under Section 58-35(a)(1) "[a] gun industry member shall not, by conduct [] unreasonable under all the circumstances . . . , knowingly or recklessly create, maintain, or contribute to a public nuisance in this State through the . . . marketing of gun-related product."

176.    Sig Sauer is a "gun industry member" under Sections 58-34 and 58-35.

177.    The Sig Sauer P320 handguns described herein are "gun-related product[s]" under Sections 58-34 and 58-35.

178.    Sig Sauer's marketing of its P320 handguns has knowingly or recklessly contributed to a public nuisance within the meaning of Section 58-35(a)(1) and N.J.S.A. 2C:58-

34, which defines a public nuisance to mean "any condition which injures, endangers, or threatens to injure or endanger or contributes to the injury or endangerment of the health, safety, peace, comfort, or convenience of others or which otherwise constitutes a public nuisance under common law." Sig Sauer's marketing is designed to cause, and has caused, customers and users to falsely believe that their P320 handguns are safe from unintentional discharge under ordinary use. As a result, New Jerseyans who might have otherwise chosen a different firearm, or taken other precautions when carrying and using, instead selected the Sig Sauer P320 or carried them with only the ordinary care that would be appropriate for a handgun that was not prone to unintended discharges, thus endangering themselves and others.

179.    Sig Sauer's marketing of its P320 handguns was unreasonable under all the circumstances described herein. See N.J.S.A. 2C:58-35(a)(1). This unreasonable marketing includes (1) affirmative statements about or related to the gun's safety from unintended discharge that were unreasonable under the circumstances, and (2) the omission of appropriate warnings in Sig Sauer's marketing statements.

180.    Sig Sauer's violation of Section 58-35(a) entitles the Attorney General to "an injunction prohibiting [Defendant] from continuing that conduct or engaging therein or doing any acts in furtherance thereof." N.J.S.A. 2C:58-35(b). Appropriate injunctive relief is necessary here to prevent further, continuing, and irreparable injury.

181.    The Attorney General is likewise entitled to an order providing for abatement and restitution, including disgorgement of profits.

182.    The Attorney General is further entitled to recover reasonable attorneys' fees, filing fees, reasonable costs of suit, and any other appropriate relief. See N.J.S.A. 2C:58-35(b).

183.    Sig Sauer's unlawful actions and/or omissions were undertaken with actual malice or accompanied by wanton and willful disregard of persons who foreseeably might be harmed by those actions or omissions, within the meaning of the Punitive Damages Act, N.J.S.A. 2A:15-5.12. Sig Sauer is therefore liable for punitive damages.

## Count Six

**Violation of New Jersey Consumer Fraud Act, N.J.S.A. 56:8-2**
**Unconscionable Commercial Practices and Deception**

184.    The Attorney General and the Acting DCA Director repeat and reallege the foregoing allegations as if set forth in their entirety herein.

185.    The Attorney General and the Acting DCA Director bring this count pursuant to the CFA.

186.    The CFA, N.J.S.A. 56:8-2, prohibits:

> The act, use or employment by any person of any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby . . . .

187.    The CFA defines "merchandise" as including "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." N.J.S.A. 56:8-1(c).

188.    The P320 handguns are merchandise within the definition of N.J.S.A. 56:8-1(c).

189.    The CFA defines "advertisement" as including "the attempt directly or indirectly by publication, dissemination, solicitation, indorsement or circulation or in any other way to induce

directly or indirectly any person to enter or not enter into any obligation or acquire any title or interest in any merchandise or to increase the consumption thereof . . . ." N.J.S.A. 56:8-1(a).

190.    At all relevant times, Sig Sauer has been engaged in the advertisement, offer for sale, and sale of P320 handguns to New Jersey consumers, including, but not limited to, advertisements disseminated on Sig Sauer's websites and social media pages.

191.    In connection with the sale and advertisement of the P320 handguns, Sig Sauer has engaged in unconscionable commercial practices and acts of deception, including, but not limited to, the following:

- deceptively stating "From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to," when such is not the case.

- affirmatively advertising the P320 to consumers as "drop safe" in 2017 when Sig Sauer was aware of drop-related safety problems;

- making deceptive statements about the P320's propensity for unintended discharge in advertisements, such as "[t]he P320 CANNOT, under any circumstances, discharge without a trigger pull – that is a fact" and "it is not possible for the P320 to discharge unless the trigger is fully actuated";

- deceptively stating that "[t]he P320's trigger safety mechanism prevents discharge unless the trigger is deliberately pulled," when, in fact, the P320's trigger safety mechanism does not prevent the gun from firing in various situations in which the user has not deliberately pulled the trigger;

- characterizing claims that the P320 has a "design flaw" as "unproven claims," when courts have entered judgments against Sig Sauer on claims alleging that the P320 was defectively designed; and

- deceptively stating that "[v]erified incidents of unintended discharges are all attributed to improper handling, incompatible equipment (i.e., holsters), trigger access vulnerability, or a lapse in firearm safety, not to any defect in the P320," when juries have, in fact, attributed a number of unintended discharges to a defect in the P320.

192.    Each unconscionable commercial practice and act of deception by Sig Sauer constitutes a separate violation of the CFA, N.J.S.A. 56:8-2.

## Count Seven

**Violation of New Jersey Consumer Fraud Act, N.J.S.A. 56:8-2**
**Misrepresentations**

193.    The Attorney General and the Acting DCA Director repeat and reallege the foregoing allegations as if set forth in their entirety herein.

194.    The Attorney General and the Acting DCA Director bring this count pursuant to the CFA.

195.    In connection with the sale and advertisement of the P320 handguns, Sig Sauer made misrepresentations to consumers, including, but not limited to, the following:

- misrepresenting that "From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to," when such is not the case.

- misrepresenting that the P320 is not prone to unintended discharges in advertisements, such as "[t]he P320 CANNOT, under any circumstances, discharge without a trigger pull – that is a fact" and that "it is not possible for the P320 to discharge unless the trigger is fully actuated," when such is not the case, and

- misrepresenting that "[t]he P320's trigger safety mechanism prevents discharge unless the trigger is deliberately pulled," when, in fact, the P320's trigger safety mechanism does not prevent the gun from firing in various situations in which the user has not deliberately pulled the trigger.

196.    Each misrepresentation by Sig Sauer constitutes a separate violation of the CFA, N.J.S.A. 56:8-2.

**Count Eight**

**Violation of N.J.S.A. 2C:58-35(a)(1)**
**Contributing to Public Nuisance by Unlawful Conduct**
**(Marketing P320s in Violation of Consumer Fraud Act)**

197.    The Attorney General repeats and realleges the foregoing allegations as if set forth in their entirety herein.

198.    The Attorney General brings this count pursuant to N.J.S.A. 2C:58-35.

199.    Under Section 58-35(a)(1) "[a] gun industry member shall not, by conduct [] unlawful in itself . . . knowingly or recklessly create, maintain, or contribute to a public nuisance in this State through the . . . marketing of a gun-related product."

200.    Sig Sauer is a "gun industry member" under N.J.S.A. 2C:58-34 and -35.

201.    The Sig Sauer P320 handguns described herein are "gun-related product[s]" under Sections 58-34 and 58-35.

202.    Sig Sauer's marketing of its P320 handguns violates the CFA, N.J.S.A. 56:8-2, as described above in connection with Counts Five and Six and was thus unlawful in itself.

203.    Sig Sauer's marketing of its P320 handguns knowingly or recklessly contributed to a public nuisance within the meaning of Sections 58-35(a)(1) and 58-34, the latter of which defines a public nuisance as "any condition which injures, endangers, or threatens to injure or endanger or contributes to the injury or endangerment of the health, safety, peace, comfort, or convenience of others or which otherwise constitutes a public nuisance under common law."

204.    Sig Sauer's violation of Section 58-35(a) entitles the Attorney General to "an injunction prohibiting [Defendant] from continuing that conduct or engaging therein or doing any acts in furtherance thereof." N.J.S.A. 2C:58-35(b).  Appropriate injunctive relief is necessary here to prevent further, continuing, and irreparable injury.

205.    The Attorney General is likewise entitled to an order providing for abatement and restitution, including disgorgement of profits.

206.    The Attorney General is further entitled to recover reasonable attorneys' fees, filing fees, reasonable costs of suit, and any other appropriate relief.  See N.J.S.A. 2C:58-35(b).

207.    Defendant's unlawful actions and/or omissions were undertaken with actual malice or accompanied by wanton and willful disregard of persons who foreseeably might be harmed by those actions or omissions, within the meaning of the Punitive Damages Act, N.J.S.A. 2A:15-5.12. Defendant is therefore liable for punitive damages.

### Count Nine

**Violation of N.J.S.A. 2C:58-35(a)(2)**
**Failure to Prevent Consumer Fraud Act Violation in Marketing P320s**
**(Reasonable Controls Violation)**

208.    The Attorney General repeats and realleges the foregoing allegations as if set forth in their entirety herein.

209.    The Attorney General brings this count pursuant to N.J.S.A. 2C:58-35(a)(2).

210.    Under Section 58-35(a)(2), "a gun industry member shall establish, implement, and enforce reasonable controls regarding its . . . marketing of gun-related products."

211.    "Reasonable controls" is defined by N.J.S.A. 2C:58-34 to mean "reasonable procedures, safeguards, and business practices that are designed to," among other things: "ensure that the gun industry member does not . . . engage in conduct that constitutes a violation of P.L. 1960, c. 39 (C.56:8-2) or any regulations promulgated thereunder."

212.    P.L. 1960, c.39 (C.56:8-2) is the CFA, N.J.S.A. 56:8-2.

213.    Sig Sauer lacks and/or has failed to implement and enforce reasonable procedures, safeguards, and business practices designed to ensure that Sig Sauer's marketing does not violate the CFA.

214. Sig Sauer thus fails to "establish, implement, and enforce reasonable controls."

215. Sig Sauer's conduct in violation of Section 58-35(a) entitles the Attorney General to "an injunction prohibiting [Sig Sauer] from continuing that conduct or engaging therein or doing any acts in furtherance thereof." N.J.S.A. 2C:58-35(b). Appropriate injunctive relief is necessary here to prevent further, continuing, and irreparable injury.

216. The Attorney General is likewise entitled to an order providing for restitution, including abatement and disgorgement of profits.

217. The Attorney General is further entitled to recover damages, reasonable attorneys' fees, filing fees, reasonable costs of suit, and any other appropriate relief. See N.J.S.A. 2C:58-35(b).

218. Sig Sauer's unlawful actions and/or omissions were undertaken with actual malice or accompanied by wanton and willful disregard of persons who foreseeably might be harmed by those actions or omissions, within the meaning of the Punitive Damages Act, N.J.S.A. 2A:15-5.12. Sig Sauer is therefore liable for punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs the Attorney General of the State of New Jersey and the Acting Director of the Division of Consumer Affairs respectfully request judgment in their favor and against Defendant Sig Sauer as follows:

    a.    Ordering injunctive relief in New Jersey as is necessary to prevent continuing harm, including but not limited to the following:

        •    An order enjoining Sig Sauer from selling P320 handguns for commercial distribution into New Jersey, for sale to civilians and local law enforcement entities; excluding a) the distribution of any P320s for the use of the United States government, including its branches, subdivisions or agencies, and b) the distribution of any P320s for use on federal property.

        •    An order enjoining Sig Sauer from marketing defective P320 handguns to New Jerseyans as (1) safe from unintended discharge, (2) as not requiring additional external safeties, (3) or as only firing when the user deliberately pulls the trigger;

    b.    Declaring that Sig Sauer's acts and practices constitute multiple instances of unlawful practices in violation of the CFA, N.J.S.A. 56:8-2;

    c.    Permanently enjoining Sig Sauer from engaging in, continuing to engage in, or otherwise doing any acts or practices in violation of the CFA, including, but not limited to, the acts and practices alleged in this First Amended Complaint, as authorized by the CFA, N.J.S.A. 56:8-8;

    d.    Awarding an order of abatement of the public nuisance at the Defendant's expense, including an order for Sig Sauer to conduct a mandatory recall of Sig Sauer P320 handguns in New Jersey, excluding a) any P320 handguns used by the United States government, including its branches, subdivisions, or agencies, and b) and P320 handguns used on federal property;

    e.    Awarding monetary damages and punitive damages in an amount to be determined at trial, including interest thereon;

    f.    Awarding restitution in an amount to be determined at trial, including disgorgement of profits;

    g.    Awarding the maximum statutory civil penalties for each and every violation of the CFA, in accordance with N.J.S.A. 56:8-13;

    h.        Awarding all costs and expenses incurred in connection with this action, including attorneys' fees, as authorized by the CFA, N.J.S.A. 56:8-11 and N.J.S.A. 56:8-19, and N.J.S.A. 2C:58-35(b); and

    i.        Awarding such other and further relief as the Court deems just and proper.

Dated: December 19, 2025
Newark, New Jersey

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiffs

By: */s/ Lucy I. Sprague*
    David E. Leit
    *Assistant Attorney General*
    Jonathan B. Mangel
    Lucy I. Sprague
    *Deputy Attorneys General*
    New Jersey Office of the Attorney General
    Division of Law
    124 Halsey Street
    P.O. Box 45029
    Newark, New Jersey 07101
    David.Leit@law.njoag.gov
    Jonathan.Mangel@law.njoag.gov
    Lucy.Sprague@law.njoag.gov